**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CARL F. SCHULTZ, JR., CINDY | : | CIVIL ACTION NO. 4:10-CV-0262 |
| SCHULTZ, MELISSA SCHULTZ, | : | |
| and BEAR & HUNTER, INC., | : | (Judge Conner) |
| t/d/b/a BIGDOGZ SPORTS BAR, | : | |
| | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| HUGHESVILLE BOROUGH, | : | |
| RICHARD SHEARER, | : | |
| KURT V. HOCKMAN, and | : | |
| MICHAEL PALMETER, | : | |
| | : | |
| Defendants | : | |

## <u>MEMORANDUM</u>

This is a civil rights action filed by plaintiffs Carl F. Shultz, Jr., Cindy

Schultz, Melissa Schultz, and Bear and Hunter, Inc., t/d/b/a BigDogz Sports Bar

against the Borough of Hughesville ("Hughesville"), former Chief of the Hughesville

Borough Police Department Richard Shearer ("Chief Shearer"), former Officer

Kurt V. Hockman ("Officer Hockman") and Officer Michael Palmeter ("Officer

Palmeter") of the Hughesville Borough Police Department .  Presently before the

court are two motions for summary judgment, one filed by defendants Hughesville

Borough and Officer Palmeter (Doc. 59), and the other filed by defendants Chief

Shearer and Officer Hockman (Doc. 56).  For the reasons that follow, the court will

grant in part and deny in part the motions.

## I.   Background[1]

### A.   The Parties

Melissa Shultz ("Melissa") is the owner and principal operator of BigDogz

Sports Bar ("BigDogz") located in Wolf Township, Pennsylvania, within walking

distance of the Hughesville boundary line.  (Doc. 58 ¶¶ 14, 37; Doc. 75 ¶¶ 14, 37; Doc.

64 ¶¶ 1-2; Doc. 74 ¶¶ 1-2).   She is also President of the corporation Bear and Hunter

Inc., a position retained since incorporation of the entity on March 4, 2005.  (Doc. 58

¶ 13, Doc. 75 ¶ 13).   Carl Shultz ("Carl"), father of Melissa, is owner of Valley

Beverage.  (Doc. 58 ¶ 1; Doc. 75 ¶ 1).   Carl spends time at BigDogz every day, but he

has no ownership interest in the bar, nor is he an employee of the establishment.

(Doc. 76, Ex. A, at 36-37; Doc. 58 ¶ 2; Doc. 75 ¶ 2).   Cindy Shultz is Carl's wife and

owner of Muncie Beverage.  (Doc. 64 ¶ 3; Doc. 74 ¶ 3).[2]

---

[1]  In accordance with the standard of review for a motion for summary
judgment, the court will present the facts in the light most favorable to the
plaintiffs, the nonmoving party.  See infra Part II.

[2]  Plaintiff Cindy Shultz brings various 42 U.S.C. § 1983 and state law claims
along with her husband, Carl Shultz.  (See Doc. 18 Counts I through XII).  However,
a spouse has no standing under Section 1983 to raise "claims resting on violations of
her husband's constitutional rights."  Pahle v. Colebrookdale Twp., 227 F. Supp. 2d
361, 281 (E.D. Pa. 2002).  There are no factual allegations in the amended complaint
involving Cindy Shultz, save for one paragraph which states in a conclusory
fashion, "[a]s a direct and proximate cause of the actions of the Defendants more
fully described herein, Plaintiff Cindy Shultz has been deprived of the services,
society and comfort provided to her by Plaintiff Carl Shultz."  (Doc. 18 ¶ 110).  Cindy
admits that she has never had any interaction with Officer Hockman or Chief
Shearer, has never made any statements to any officer of the Hughesville Borough
Police Department, and has never been arrested or charged with any crime related
to this litigation.  (Doc. 64 ¶¶ 4-7; Doc. 74 ¶¶ 4-7; see also Doc. 58 ¶¶ 10-12; Doc. 75 ¶¶
10-12).  Indeed, there is nothing in the complaint or record evidence to support any

Defendants are Hughesville Borough and current or former members of the Hughesville Borough Police Department ("HBPD"). Former Hughesville Police Chief Richard Shearer began his law enforcement career in 1991. (Doc. 58 ¶ 39; Doc. 75 ¶ 39). He had two stints of employment with HBPD: a period from 1993 to 1995, and a period from January 1999 to February 2010. (Doc. 58 ¶¶ 41-42; Doc. 75 ¶¶ 41-42). Shearer became Chief of Police of HBPD in late 2007. (Doc. 58 ¶ 43; Doc. 75 ¶ 43). On February 8, 2010, the Hughesville Borough Council voted to terminate Chief Shearer's employment with Hughesville. (Doc. 80, Ex. NN). Officer Hockman began his employment with HBPD four years prior to the principal incident in this litigation—the June 6, 2009 traffic stop in the turn lane leading to BigDogz. (Doc. 63, Ex. J, at 58). Officer Palmeter began his employment with HBPD approximately one year prior to that incident. (Doc. 63, Ex. J, at 30).[3]

---

causes of action brought by her. Therefore, the court will grant summary judgment to defendants on all claims brought by Cindy.

[3] To the extent Carl, Melissa and Bear and Hunter, Inc. bring claims against Chief Shearer, Officer Hockman and Officer Palmeter in their official capacity, the court grants summary judgment to these defendants on the official capacity claims. Asserting a claim against a government employee in his or her official capacity is simply another way of asserting a claim against the public entity, and Hughesville Borough is a named defendant. Mitros v. Borough of Glenolden, 170 F. Supp. 2d 504, 506 (E.D. Pa. 2001) (citing Brandon v. Holt, 469 U.S. 464, 471-72 (1985)) ("Where a suit is brought against a public offic[ial] in his official capacity, the suit is treated as if [it] were brought against the governmental entity of which he is an offic[ial].").

B.    **The Conduct**

*Alleged Harassment*

The instant litigation revolves around what plaintiffs believe to be the

unlawful targeting of the BigDogz establishment by members of HBPD.  BigDogz

Sports Bar is located in Wolf Township, Pennsylvania, on State Route 220, near the

border of Hughesville.  Patrons of BigDogz access the establishment by way of a

Pennsylvania Department of Transportation right-of-way turn lane.  (Doc. 58 ¶ 47;

Doc. 75 ¶ 47).  Located across the street from BigDogz on State Route 220, also

within Wolf Township jurisdiction, is a Citgo Pit Stop fuel station ("Pit Stop").

(Doc. 58 ¶ 38; Doc. 75 ¶ 38).  Hughesville maintains a Citgo credit card for fueling its

police cruisers, and officers frequently fuel their vehicles at the Pit Stop, sometimes

after the Pit Stop convenience store is closed.  (Doc. 58 ¶ 61; Doc. 75 ¶ 61).  It is

undisputed that HBPD does not possess, nor has it ever sought, jurisdiction to

patrol within Wolf Township.  (Doc. 58 ¶ 66; Doc. 75 ¶ 66).

Carl, Melissa, and Bear and Hunter, Inc. contend that, despite HBPD's lack

of jurisdiction in Wolf Township, members of HBPD would park at the Pit Stop and

watch BigDogz, intentionally conduct traffic stops in the turn lane leading to

BigDogz, and follow BigDogz patrons and employees exiting the establishment.

Carl, Melissa and employees of BigDogz report numerous comments and

complaints from patrons about the police presence.  (See e.g., Doc. 77, Ex. F, at 13-

14; Doc. 77, Ex. E, at 15, 17; Doc. 77, Ex. G, at 22-24).  Melissa testified that she

frequently viewed officers filling up their police cruisers at the Pit Stop.  (Doc. 64 ¶¶

4

19, 22; Doc. 74 ¶¶ 19, 22).  Employees and patrons of BigDogz observed HBPD

cruisers at the Pit Stop on many occasions, sometimes not fueling but simply

parked in a manner to observe the BigDogz establishment.  (Doc. 77, Ex. F, at 10-13;

Doc. 77, Ex. G, at 21-22; Doc. 77, Ex. I, at 9-10; Doc. 78, Ex. J, at 12-14).  Several

patrons reported being followed by HBPD after exiting the BigDogz establishment

or Carl's business, Valley Beverage.  (Doc. 76, Ex. D, at 11-14; Doc. 77, Ex. E, at 9, 12,

13 Doc. 77, Ex. F, at 10-12; Doc. 77, Ex. H, at 13-14, 18; Doc. 77, Ex. I, at 11-13; Doc.

78, Ex. J, at 20-21).  Additionally, employees reported numerous traffic stops by

HBPD in BigDogz' turn lane.  (Doc. 77, Ex. E, at 15-16).

Chief Shearer testified that he received almost daily complaints from Carl or

others at BigDogz regarding HBPD conduct outside the Borough near the BigDogz

establishment.  (Doc. 79, Ex. Q, at 25).  Chief Shearer also reported conducting over

100 traffic stops in his career with HBPD in the vicinity of BigDogz.  (Doc. 79, Ex. P,

at 124-125).  In addition to their complaints to HBPD about police monitoring, Carl

and Melissa contacted their state representative, also their attorney, Garth Everrett,

Esquire, about HBPD conduct.  (Doc. 76, Ex. A, at 11).  Everrett, in turn, contacted

the mayor of Hughesville, Frank Welsh,[4] about HBPD presence near BigDogz.

(Doc. 78, Ex. M, at 62-63).  On one occasion, Carl contacted Mayor Welsh directly to

---

[4] Hughesville Borough has had three mayors over the course of events at issue in this litigation: Mayor William Edner (2000 through November of 2007) (Doc. 78, Ex. K, at 10-11), Mayor Frank Welsh (November 2007 to January 2010) (Doc. 78, Ex. M, at 77), and Mayor Walter Reed (January 2010 to present).  (Doc. 78, Ex. L, at 12).

complain about HBPD police cruisers sitting at the Pit Stop.  (Doc. 78, Ex. M, at 62).

Chief Shearer spoke with Mayor Welsh about these complaints, and Mayor Welsh

issued a directive to HBPD to refrain from responding to calls about BigDogz or

Valley Beverage without Pennsylvania State Police presence on the scene.  (Doc. 79,

Ex. P, at 70-72).  Neither Carl or Melissa registered complaints directly with the

Hughesville Borough Council about alleged police harassment.  (Doc. 58 ¶¶ 21, 87;

Doc. 75 ¶¶ 21, 87).  Nevertheless, according to Chief Shearer, Hughesville Borough

Council was aware of the complaints and Mayor Welsh's directive.  (Doc. 79, Ex. P,

at 70-72).

### *June 6, 2009 Traffic Stop*

Conflict between the parties reached a boiling point on June 6, 2009.  At

approximately 9:48 p.m. that evening, Officer Palmeter initiated a lawful traffic stop

of a motorcyclist in the Route 220 turn lane leading to BigDogz.  (Doc. 58 ¶¶ 91-92;

Doc. 75 ¶¶ 91-92).  Suspecting a DUI violation, Officer Palmeter radioed Officer

Hockman—a field sobriety test certified officer—for backup.  (Doc. 58 ¶ 93; Doc. 75 ¶

93).  When Officer Hockman arrived, he pulled in behind Officer Palmeter's vehicle

and activated his dashboard camera video and audio recording device.  (Doc. 81,

Ex. HH).  As Officer Palmeter was escorting the motorcyclist to the rear of the

police cruiser Carl Schultz approached the officers in the turn lane and inquired

"you guys gonna be out here that much longer, its ten o'clock."  (Doc. 58 ¶¶ 94-95;

Doc. 75 ¶¶ 94-95).  Officer Palmeter responded that the stop would last as long as

necessary to handle situation and explained: "I know it's ten o'clock, but you need

to get going . . . wherever you're going you can't be here - Okay?" (Doc. 81, Ex. HH).

Officer Hockman engaged Carl in a discussion as to his involvement in the traffic

stop. Carl claimed that the traffic stop was taking place on his property (Doc. 58 ¶¶

105, 108; Doc. 75 ¶¶ 105, 108; Doc. 79, Ex. Q, at 63), and told Officer Hockman that he

intended to telephone his attorney about the police conduct. (Doc. 58 ¶ 99; Doc. 75 ¶

99). Carl retreated some distance from the traffic stop into the BigDogz parking

lot—the exact distance is disputed—and proceeded to make a telephone call. (Doc.

58 ¶¶ 109, 110; Doc. 75 ¶¶ 109, 110). As a result of Carl's interaction with the police

stop, Officer Hockman radioed Chief Shearer for backup. (Doc. 58 ¶ 102; Doc. 75 ¶

102). Thereafter, Carl returned to the entrance area of Bigdogz. (Doc. 81, Ex. II).

When Chief Shearer arrived at the scene Officer Hockman advised him that

Carl was interfering with the traffic stop. (Doc. 58 ¶ 115; Doc. 75 ¶ 115). Officer

Hockman provided Chief Shearer with the microphone device from his police

cruiser and together they proceeded to BigDogz to speak with Carl. (Doc. 58 ¶¶ 116-

117; Doc. 75 ¶¶ 116-117). The parties dispute whether the microphone was visible

during the ensuing conversation. Chief Shearer opened the door to the

establishment and requested that Carl step outside to speak with the officers. (Doc.

58 ¶ 123; Doc. 75 ¶ 123). After some hesitance, Carl exited along with an employee

of BigDogz. (Doc. 81, Ex. HH). Chief Shearer warned Carl that if he ever interfered

with another traffic stop again, he would be arrested. (Id.) Carl maintained that

the traffic stop occurred on his property, and stated that he was tired of police

intimidation of his clientele. (Id.) The officers explained that they were not

attempting to harm BigDogz business, that they were simply doing their job, and that they could not control where individuals pulled over during traffic stops. (Id.) Carl informed the officers that the parties would have to settle the matter in court. (Id.) Officer Hockman and Chief Shearer returned to their patrol cars, and Chief Shearer returned the microphone to Officer Hockman. (Id.) A discussion ensued about contacting the Pennsylvania Liquor Control Board ("PLCB") to report Carl's conduct. Later that night, Officer Hockman contacted the PLCB and filed a complaint. (Doc. 80, Ex. V).

### *Charges Against Carl Shultz*

After speaking with Officers Hockman and Palmeter about Carl's conduct during the traffic stop and after reviewing the police cruiser dashboard camera video, Chief Shearer prepared a criminal complaint and affidavit of probable cause against Carl. (Doc. 58 ¶ 128; Doc. 75 ¶ 128; Doc. 64 ¶ 11; Doc. 74 ¶ 11). The criminal complaint charged Carl with obstructing the administration of law or other government functions and disorderly conduct pursuant to Pennsylvania Criminal Code sections 5101(a) and 5503. (Doc. 58 ¶ 130; Doc. 75 ¶ 130). Chief Shearer did not discuss his decision to file the criminal complaint with Officers Hockman or Palmeter. (Doc. 58 ¶ 129; Doc. 75 ¶ 129; Doc. 64 ¶ 9; Doc. 74 ¶ 9). However, prior to filing, Chief Shearer sought the approval of Assistant Lycoming County District Attorney Henry Mitchell ("ADA Mitchell"). (Doc. 58 ¶ 131; Doc. 75 ¶ 131). ADA Mitchell reviewed and approved the complaint based on the information contained in the documents, but without viewing the video of the traffic stop. (Doc. 80, Ex.

8

DD).  The complaint issued on June 12, 2009 and Carl received the summons and a

fingerprint order by certified mail.  (Doc. 76, Ex. A, at 23).  The fingerprint order

required Carl to report to HBPD within three weeks for fingerprinting and

photographing.

### *Williamsport Sun Gazette Newspaper Article*

On July 2, 2009, shortly after Chief Shearer filed charges against Carl, the

*Williamsport Sun Gazette* published an article about two incidents occurring at

BigDogz.  (Doc. 63, Ex. K, at 2).  The article mistakenly identified Carl as the owner

of the bar, and reported the charges filed against him for allegedly interfering with

a traffic stop in front of the establishment on June 6, 2009.  (Id.)  The other reported

incident involved an unruly patron who was asked to leave the establishment and

damaged some property in the parking lot before attempting to flee from police.

(Doc. 63, Ex. K, at 2).  There is no evidence that Chief Shearer or Officer Hockman

had any contact with the newspaper regarding the article.  (Doc. 58 ¶ 134, 138; Doc.

75 ¶ 134, 138).  Ostensibly, the author of the article procured the factual basis for the

article from public court documents.  (Doc. 58 ¶ 135; Doc. 75 ¶ 135).

### *Preliminary Hearing and Subsequent Dismissal of Charges*

On September 17, 2009, the Honorable District Justice C. Roger McRae in the

Lycoming County Magisterial District Court held a preliminary hearing on the

charges.  (Doc. 79, Ex. Q).  The dashboard camera video was not displayed or

otherwise entered into evidence during the preliminary hearing.  (Id.)  Subsequent

to the testimony of Chief Shearer, Officer Palmeter and Officer Hockman, Judge

McRae bound the charges over to the Court of Common Pleas of Lycoming County for trial. (Doc. 58 ¶ 132; Doc. 75 ¶ 132). Judge McRae released Carl on an unsecured, nonmonetary bail, ordered Carl to refrain from any contact with potential Commonwealth witnesses and directed him to apprise the court of any change of address. (Doc. 18, ex. F). Prior to trial, on January 11, 2010, ADA Mitchell *nol prossed* the charges against Carl. (Doc. 80, Ex. DD ¶ 7). By sworn affidavit, Attorney Mitchell stated that, after viewing the dashboard camera audio and video, he "did not believe probable cause existed to continue the case." (Doc. 80, Ex. DD ¶¶ 5-6).

### *Continuing Harassment and Complaints*

On February 3, 2010, plaintiffs filed their initial complaint in this court alleging civil rights violations pursuant to 42 U.S.C. § 1983. (See Doc. 1). Subsequent to filing the complaint, plaintiffs allege continuing harassment by members of the HBPD, including continued surveillance of Valley Beverage and BigDogz. (Doc. 58 ¶ 144; Doc. 75 ¶ 144). Carl reports being followed by HBPD after leaving BigDogz. (Doc. 80, Ex. FF ¶¶ 38, 39). Beginning in July 2010, Carl, along with other BigDogz employees, have maintained notes regarding the dates, times, and locations of HBPD presence near the BigDogz establishment. (Doc. 64 ¶¶ 28, 32-33; Doc. 74 ¶¶ 28, 32-33). Neither Chief Shearer, who was released from employment with Hughesville in February 2010, nor Officer Hockman have been involved in these recent activities. (Doc. 58 ¶ 145; Doc. 75 ¶ 145). Carl admits that

HBPD surveillance diminished after Chief Shearer's termination, and HBPD

conduct no longer interferes with BigDogz business.  (Doc. 80, Ex. FF ¶¶ 45, 46).

<u>Prior HBPD Conduct</u>

Plaintiffs contend that the Borough of Hughesville condoned the targeting of

BigDogz and the filing of criminal charges against Carl.  The record reflects several

incidents of alleged misbehavior by HBPD officers— particularly Chief

Shearer—extending back to 2000.  In 2000, an individual sued Chief Shearer for

civil rights violations relating to an arrest which occurred outside the jurisdiction of

Hughesville.  (Doc. 81, Ex. MM).  The matter apparently settled prior to trial.  (Doc.

64 ¶ 38; Doc. 74 ¶ 38).  In 2000, Shearer took a cup of coffee from a Hughesville mini

mart without paying.  (Doc. 64 ¶ 39; Doc. 74 ¶ 39).  The clerk requested that Shearer

pay, but he refused.  (Doc. 64 ¶ 40; Doc. 74 ¶ 40).  Shearer testified that the incident

was a misunderstanding, as there was a prior practice of providing free coffee to

police officers.  (Doc. 63, Ex. C, at 7).  As a result of the coffee incident, Hughesville

suspended Shearer for six weeks.  (Doc. 64 ¶ 40; Doc. 74 ¶ 40).  An internal

investigation prompted by the coffee incident concluded that Shearer was "over

zealous" at times, but it did not recommend his dismissal from the force.  (Doc. 81,

Ex. KK, at 4).  Another incident involved the alleged confiscation of citizens'

firearms by the HBPD.  (<u>See</u> Doc. 18 ¶ 130; Doc. 74 ¶ 41).  Plaintiffs also allege an

incident in which Chief Shearer and Officer Hockman purportedly seized and

searched the cellular telephones of teenage girls.  (Doc. 64 ¶¶ 44; Doc. 74 ¶¶ 44).

Shearer denies any knowledge of, or involvement in, this alleged search and seizure. (Doc. 64 ¶¶ 44-45; Doc. 74 ¶¶ 44-45).

Former Hughesville Borough Police Chiefs gave Chief Shearer a series of reprimands, verbal and written, related to various activities outside the Borough and related to HBPD procedural issues. In January of 2005, then Chief of Police Randy Eddinger delivered a memorandum to Officer Shearer noting "several times" when Shearer handled incidents outside Hughesville. The memorandum warned Officer Shearer that such conduct violated a prior memorandum and that future violations would be punished with suspensions. (Doc. 80, Ex. W). Former Hughesville Chief of Police Joseph Walker stated that he gave numerous verbal reprimands to Shearer regarding Shearer's activity outside of Hughesville's jurisdiction and reported Shearer's conduct to Mayor Edner. (Doc. 81, Ex. GG ¶¶ 9, 10-11, 16). In 2002 and 2007 Shearer received a written order and warning regarding his failure to follow HBPD procedure and his failure to call activity into the county dispatcher. (See Doc. 80, Ex. OO; Doc. 80, EX. QQ).

The record reflects that, to a certain extent, the mayors of Hughesville were cognizant of the public's concerns with HBPD. After Mayor Welsh took office, he issued a memorandum stating that "accountability was a foreign concept within the police department." (Doc. 80, Ex. U). Later, Mayor Welsh clarified his statement as referring to time and financial accountability necessary to run an efficient department. (Doc. 78, Ex. M, at 38). Hughesville Mayor Walter Reed learned of Carl Shultz's complaints about HBPD officers sitting at the Pit Stop prior to taking

12

office in January 2010.  (Doc. 58 ¶¶ 62, 89; Doc. 75 ¶¶ 62, 89; (Doc. 64 ¶ 51; Doc. 74 ¶

51).  Reed testified that he personally conducted an investigation about whether

officers remained at the Pit Stop for extended periods of time and did not find any

impropriety.  (Doc. 58 ¶ 63; Doc. 75 ¶ 63; Doc. 64 ¶ 52; Doc. 74 ¶ 52).

### C.   Procedural History

Plaintiffs filed their initial complaint on February 3, 2010, and an amended

complaint on May 5, 2010, asserting thirteen counts against Chief Shearer, Officer

Hockman, Officer Palmeter and Hughesville, including First, Fourth, and

Fourteenth Amendment claims under the federal Constitution and state law claims

for malicious prosecution, intentional infliction of emotional distress, defamation,

invasion of privacy, and violation of the Wiretapping and Electronic Surveillance

Control Act, 18 PA. CONS. STAT. § 5701 et seq.  (Doc. 18).  On June 18, 2010, Officer

Palmeter and Hughesville Borough filed a motion to dismiss.  (See Doc. 28).  By

memorandum and order dated December 13, 2010, the court granted the motion in

part.  (Doc. 54).  On January 4, 2011, Officer Palmeter and Hughesville filed one of

the two motions for summary judgment presently before the court.  (Doc. 59).  Chief

Shearer and Officer Hockman filed the second motion on the same day.  (Doc. 56).

The motions have been fully briefed and are ripe for disposition.[5]

---

[5] Although plaintiffs have asserted a claim of intentional infliction of
emotional distress against Chief Shearer, Officer Hockman and Officer Palmeter
(see Doc. 18, at 30, Count X), plaintiffs admit that they have not provided sufficient
evidence to succeed on such a claim.  (See Doc. 72, at 26; Doc. 73, at 30).  The court
will therefore grant summary judgment to Chief Shearer, Officer Hockman, and
Officer Palmeter on that claim without further discussion.

## II.  **Standard of Review**

Through summary adjudication the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  See Fed. R. Civ. P. 56(a).  The burden of proof is upon the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); Fed. R. Civ. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also Fed. R. Civ. P. 56(a), (c), (e).  Only if this threshold is met may the cause of action proceed.  Pappas, 331 F. Supp. 2d at 315.

## III.  **Discussion**

Section 1983 of Title 42 of the United States Code offers private citizens a means to redress violations of federal law by state officials.  See 42 U.S.C. § 1983. The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Id.  Section 1983 is not a source of substantive rights, but merely a method to vindicate violations of federal law committed by state actors.  Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  To establish a claim under this section, the plaintiff must show a deprivation of a "right secured by the Constitution and the laws of the United States . . . by a person acting under color of state law."  Id. (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)).  For purposes of § 1983, a corporation is a person who may bring suit for deprivation of rights secured under the Constitution.  See Safeguard Mut. Ins. Co. v. Miller, 472 F.2d 732, 733 (3d Cir. 1973) (citing Pierce v. Soc'y of the Sisters of the Holy Names of Jesus and Mary, 268 U.S. 510, 535 (1925)); Des Vergnes v. Seekonk Water Dist., 601 F.2d 9, 17 (1st Cir. 1979); see also Addiction Specialists, Inc. v. Twp. of Hampton, 411 F.3d 399, 407 n.6 (3d Cir. 2005) (corporation has standing to bring constitutional claims on its behalf); Gwynedd Properties, Inc. v. Lower Gwynedd Twp., 970 F.2d 1195 (3d Cir. 1992) (corporation brought § 1983 action against Township for violation of due process rights); Levy v. Pappas, 510 F.3d 755, 762 (7th Cir. 2007) ("Generally speaking, a corporation may sue under § 1983.") abrogated on other grounds by Levin v. Commerce Energy, Inc., --- U.S. ---, 130 S. Ct. 2323, 2330 (2010).

Carl, Melissa and Bear and Hunter, Inc. allege violations of their First, Fourth, and Fourteenth Amendment rights, as well as state law claims for malicious prosecution, defamation, invasion of privacy, and Wiretapping and Electronic Surveillance Control Act, 18 PA. CONS. STAT. § 5701 et seq, violations against Hughesville, Chief Shearer, Officer Hockman, and Officer Palmeter.

15

## A.   **Fourth Amendment Claims**

### 1.   **Malicious Prosecution**

Carl asserts a Fourth Amendment malicious prosecution claim against Chief Shearer, Officer Hockman and Hughesville.[6]  To prevail on Fourth Amendment malicious prosecution claim in a § 1983 action, Carl must show: (1) defendants initiated a criminal proceeding; (2) the criminal proceeding terminated in Carl's favor; (3) the proceeding was initiated without probable cause; (4) defendants acted maliciously or for a purpose other than bringing Carl to justice; and (5) Carl suffered a deprivation of liberty consistent with the concept of seizure as a consequence of the legal proceeding.  McKenna v. City of Philadelphia, 582 F.3d 447, 461 (3d Cir. 2009) (citing Estate of Smith v. Marasco, 318 F.3d 497, 521 (3d Cir. 2003).  A prosecution  instituted without probable cause does not, by itself, constitute a deprivation of a constitutional right; rather, it is the deprivation of constitutional rights that accompany the prosecution—such as the constitutional right to be free from unwarranted seizures—that provides the basis for a Fourth Amendment malicious prosecution claim.  Dibella v. Borough of Beechwood, 407 F.3d 599, 602-03 (3d Cir. 2005) (citing Gallo v. City of Philadelphia, 161 F.3d 217 (3d Cir. 1998).  Mere attendance at trial is insufficient to constitute a Fourth Amendment seizure.  Id. at 603.

---

[6] The court dismissed the Fourth Amendment malicious prosecution claim against Officer Palmeter in its Memorandum and Order dated December 13, 2010. (Doc. 54).

Chief Shearer and Officer Hockman assert that Carl cannot satisfy the "seizure" element of a § 1983 malicious prosecution claim because he was never taken into custody, arrested, handcuffed or placed in a holding cell.  (Doc. 57, at 7). Carl contends that the seizure element is satisfied because he was held in pretrial custody when he reported to the police department for fingerprinting and photographing.  (Id. at 14-15).  Moreover, he argues that he "suffered onerous pretrial restrictions," including the posting of bail in the amount of $2,000, a requirement to advise the court of any change in address, and a prohibition against contact with potential Commonwealth witnesses.  (Id.)  Carl contends that the latter restriction prevented him from addressing continued harassment by HBPD.  (Id. at 15-16).

Arrest, detention and/or the placement of an individual in handcuffs are not the only means to establish seizure.  See Gallo, 161 F.3d at 222-23.  Particularly onerous pretrial restrictions may constitute a seizure.  Id. at 222-25.  For example, in Gallo v. City of Philadelphia, the Third Circuit held that Gallo was seized for purposes of his Fourth Amendment malicious prosecution claim when he was required to post a $10,000 bond, attend all court hearings, contact pretrial services on a weekly basis, and he was prohibited from traveling outside of New Jersey or Pennsylvania.  Id. at 222.  Deeming it a "close question" the court concluded that the combination of restrictions amounted to a seizure.  Id. at 225.  By contrast, in Dibella v. Borough of Beachwood, 407 F.3d 599 (3d Cir. 2005), the Third Circuit concluded that plaintiffs failed to establish that they were "seized" for Fourth

17

Amendment purposes—plaintiffs were only issued a summons, they were never

arrested; they never posted bail; they were free to travel; they were not required to

report to pretrial services; and, the only time their liberty was restricted was during

the Municipal Court trial.  Id. at 603; see also Bristow v. Clevenger, 80 F. Supp. 2d

421, 429-30 (M.D. Pa. 2000) (finding that plaintiff was not seized for purposes of

Fourth Amendment malicious prosecution claim where she was fingerprinted and

photographed, attended a pretrial conference, and attended a judicial proceeding in

which the district attorney's office withdrew the criminal charges against her).

In the instant matter, Carl was neither taken into custody nor arrested.  He

was never handcuffed or placed in a holding cell.  After Judge McRae bound over

the charges, he released Carl on unsecured signature bail.  The only additional

restrictions required Carl to notify the court of any change in address and to refrain

from contact "with any potential Commonwealth witnesses."  Unlike Gallo, Judge

McRae did not require Carl to contact pretrial services on a weekly basis, and the

court placed no restrictions on his travel.  Carl argues that, during the

fingerprinting process, Officer Hockman detained Carl for an extended period of

time due to issues with his social security number.  Carl's criminal defense attorney

in the matter, Kyle Rude, Esquire, who was present with Carl during the

fingerprinting process, stated that the delay with Carl's social security number

lasted ten minutes.  (Doc. 80, Ex. EE ¶ 6).  Carl, on the other hand, describes a

longer delay—between fifteen and thirty minutes.  (Doc. 80, Ex. FF ¶ 28).  This

distinction is immaterial to the court's analysis.  A delay of thirty minutes or less

18

does not rise to the level of a Fourth Amendment "seizure." See Bristow, 80 F. Supp. 2d at 430 (finding that criminal processing, including fingerprinting and photographing, did not amount to a seizure); see also Perkins v. Staskiewicz, 2010 WL 2510191, at *4 (M.D. Pa. June 17, 2010) (concluding that requiring plaintiff to submit to fingerprinting and photographing and attend court proceedings was "legally insufficient to constitute a deprivation of liberty as the term is meant in the context of a Fourth Amendment malicious prosecution claim").  Carl cannot establish that he was seized and therefore his Fourth Amendment malicious prosecution claim must fail.  Chief Shearer and Officer Hockman's motion for summary judgment will be granted with respect to this claim.

## 2.   **False Arrest**

Carl also asserts a Fourth Amendment false arrest claim against Chief Shearer and Officer Hockman.  To succeed on a § 1983 false arrest claim, a plaintiff must establish that the arrest was made without probable cause.  See Brockington v. City of Philadelphia, 354 F. Supp. 2d 563, 568 (E.D. Pa. 2005) (citing Patzig v. O'Neil, 577 F.2d 841, 848 (3d Cir. 1978)); see also Orsatti v. New Jersey State Police, 71 F.3d 480, 482 (3d Cir. 1995) (Fourth Amendment prohibits arrest except upon probable cause).  Chief Shearer and Officer Hockman contend that probable cause existed for the criminal complaint and affidavit of probable cause.  Carl responds that probable cause was lacking.  Neither side addresses the threshold requirement of a false arrest claim: *an arrest*.

An arrest is a seizure of the person.  See Bristow, 80 F. Supp. 2d at 436;

Curran v. Dural, 512 F. Supp. 699, 703 (E.D. Pa. 1981); see also Black's Law

Dictionary 124 (9th ed. 2009) (defining arrest as "[a] seizure or forcible restraint" or

"[t]he taking or keeping of a person in custody by legal authority, esp. in response

to a criminal charge; specif., the apprehension of someone for the purpose of

securing the administration of the law, esp. of bringing that person before a court").

In the absence of a formal arrest, the court must consider whether the plaintiff can

establish a "restraint on freedom of movement of the degree associated with formal

arrest." Bristow, 80 F. Supp. 2d at 436.

It is undisputed that Carl was not formally arrested.  After Chief Shearer filed

the criminal complaint and affidavit of probable cause, Carl received a summons by

certified mail.  (Doc. 76, Ex. A, at 23).  Carl had three weeks to report for

fingerprinting and photographing, and Judge McRae released him on unsecured

signature bail.  As previously discussed, the restrictions placed on Carl do not

establish that he was seized for Fourth Amendment purposes.  See Colbert v.

Angstadt, 169 F. Supp. 2d 352, 358-359 (E.D. Pa. 2001) (plaintiff who received

summons by mail and was not formally arrested did not suffer an arrest or restraint

on freedom of movement to a degree associated with formal arrest for purposes of

false arrest claim); Bristow, 80 F. Supp. 2d at 435-36 (summary judgment in favor of

defendants on false arrest claim warranted where criminal complaint was filed

against plaintiff, but plaintiff was never arrested or restricted in her freedom of

movement); Curran, 512 F. Supp. at 703 (summons compelling plaintiff's

appearance before magistrate did not establish seizure for false arrest claim); <u>see</u> <u>also</u> <u>United States v. Dionisio</u>, 410 U.S. 1, 8-9 (1973) (holding that a subpoena to appear before a grand jury to provide a voice sample for identification purposes did not amount to a seizure in the Fourth Amendment sense "even though that summons may be inconvenient or burdensome").

The Supreme Court recognizes "that district courts . . . possess the power to enter summary judgment *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 326 (1986); <u>see</u> <u>also</u> <u>Gibson v. Mayor & Council of Wilmington</u>, 355 F.3d 215, 222 (3d Cir. 2004); <u>Chambers Dev. Co. v. Passaic Cnty. Utils. Auth.</u>, 62 F.3d 582, 584 n.5 (3d Cir. 1995).   Before a district court grants summary judgment to a non-moving party it must first place the adversarial party on notice that the court is considering such *sua sponte* action.  <u>See</u> <u>Gibson</u>, 355 F.3d at 222.  The Third Circuit explained that notice means "that the targeted party 'had reason to believe the court might reach the issue and received a fair opportunity to put its best foot forward.'" <u>Id.</u> at 223 (quoting <u>Leyva v. On the Beach, Inc.</u>, 171 F.3d 717, 720 (1st Cir. 1999) and <u>Jardines Bacata, Ltd. v. Diaz-Marquez</u>, 878 F.2d 1555, 1561 (1st Cir. 1989)) (quotations omitted).

Despite the general notice requirement to the nonmoving party, the Third Circuit has concluded that, notice to the adversarial party is not required in three circumstances: (1) when there exists a fully developed record; (2) when the

adversarial party would not be prejudiced by a *sua sponte* grant of summary

judgment; and (3) when the decision is based on a purely legal issue. Id.[7]  Thus,

> [w]here it appears clearly upon the record that all of the evidentiary
> materials that a party might submit in response to a motion for
> summary judgment are before the court, a *sua sponte* grant of
> summary judgment against that party may be appropriate if those
> materials show no material dispute of fact exists and that the other
> party is entitled to judgment as a matter of law.

Id. at 224 (quoting Ramsey v. Coughlin, 94 F.3d 71, 74 (2d Cir. 1996)).

Cognizant of the Third Circuit's cautionary standard, the court finds that *sua

sponte* grant of summary judgment is appropriate in the instant case.  The record

before the court is fully developed.  Both parties addressed the issue of seizure with

respect to the Fourth Amendment malicious prosecution claim.  The parties' failure

to address arrest or seizure within their discussion of the Fourth Amendment false

arrest claim may have been an oversight or simply the result of an assumption that

the seizure discussion would apply to both Fourth Amendment claims without

explicitly stating such.  The facts surrounding the issuance of the summons and the

restraints on Carl's freedom (fingerprinting and photographing, unsecured bail, no

contact with potential witnesses for Hughesville, and a requirement to inform the

borough of any change of address) are undisputed.  The only question is whether

---

[7]  The court in Gibson found all three circumstances present in upholding the
district court's *sua sponte* grant of summary judgment.  Gibson, 355 F.3d at 224.
The court declined to address whether the presence of some, but not all three
circumstances would be sufficient to except the court from the notice requirement.
Id.; see also DL Resources, Inc. v. FirstEnergy Solutions Corp., 506 F.3d 209, 224
n.14 (3d Cir. 2007) (again declining to address the question).

these facts establish a restraint of freedom of movement of the degree associated with a formal arrest. The court finds that Carl was merely subject to routine processing as the result of minor criminal charges. He received his summons in the mail and was provided ample time to comply. Thereafter, he was released without any significant restrictions in his freedom of movement. Although the summons and fingerprinting were inconvenient, they do not amount to a Fourth Amendment seizure. The court will grant summary judgment to Chief Shearer and Officer Hockman on the Fourth Amendment false arrest claim.

### 3. <u>Municipal Liability</u>

Carl alleges that Hughesville had a policy, practice or custom of supporting HBPD's purportedly unconstitutional acts, thus subjecting the Borough to liability for Fourth Amendment malicious prosecution and false arrest. (Doc. 18, Counts II, IV). It is well-settled that municipalities and other local government entities may not be held liable under § 1983 for the acts of their employees under a theory of *respondeat superior* or vicarious liability. <u>See</u> <u>Monell v. Dep't of Soc. Servs. of the City of New York</u>, 436 U.S. 658 (1978). A municipality may, however, be held liable if the plaintiff can "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." <u>Bd. of Cnty. Comm'rs v. Brown</u>, 520 U.S. 397, 403 (1997) (citing <u>Monell</u>, 436 U.S. at 694.

A policy is an official proclamation or edict of a municipality. <u>Beck v. City of Pittsburgh</u>, 89 F.3d 966, 971 (3d Cir. 1996) (quoting <u>Andrews v. City of Phila.</u>, 895 F.2d 1469, 1480 (3d Cir. 1990) (citations omitted); <u>see also</u> <u>Watson v. Abington Twp.</u>,

23

478 F.3d 144, 155 (3d Cir. 2007) (reiterating that municipal policy exists when an individual with final decisionmaking authority "issues an official proclamation, policy, or edict"). "A custom is an act 'that has not been formally approved by an appropriate decisionmaker,' but that is 'so widespread as to have the force of law." Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003) (quoting Brown, 520 U.S. at 404). A custom may be established by proving knowledge of, and acquiescence to, a practice. Watson v. Abington Twp., 478 F.3d 144, 156 (3d Cir. 2007) (internal citations omitted). The policy or custom upon which a plaintiff bases a § 1983 claim must emanate from individuals with the authority to promulgate municipal standards in the relevant area. See LaVerdure v. County of Montgomery, 324 F.3d 123, 126 (3d Cir 2003) ("To be a policymaker for § 1983 purposes, an official must have *final* policymaking authority.").

Courts have noted three scenarios in which a government employee's actions may be deemed to be the result of a policy or custom of the entity that subjects the municipality to § 1983 liability: (1) when an appropriate officer or entity promulgates a statement of policy and the employee's act is an implementation of that policy; (2) when the act of the policymaker violates federal law; and (3) when a policymaker fails to act affirmatively despite the obvious need for action to control agents of the government. Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003). The instant matter implicates the third scenario. Carl avers that Hughesville officials knew of and acquiesced in the alleged unconstitutional actions of the HBPD and its officers.

24

Culled to its essence, the amended complaint alleges that Hughesville, and the Mayor specifically, failed to train its police officers regarding individuals' Fourth Amendment constitutional rights.[8] (See Doc. 18 ¶¶ 26-32, 124-138).  Failure to train is a valid basis for § 1983 liability only when such failure amounts to deliberate indifference.  Beck, 89 F.3d at 971-72 (noting the adoption of the deliberate indifference standard in other policy/custom contexts outside the area of police training) (citing City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989)); Young v. Pleasant Valley Sch. Dist., No. 3:07-cv-854, 2008 WL 417739 at *5 (M.D. Pa. Feb 13, 2008).

To succeed, plaintiffs must also establish that the deficiency in training is related to the ultimate injury.  City of Canton, 489 U.S. at 391.  In other words, the acquiescence, encouragement or condonation must contribute to the injury.  Beck, 89 F.3d at 972 (citing Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990)).  Thus, plaintiffs must demonstrate a "plausible nexus" or "affirmative link" between the custom and the deprivation of constitutional rights.  Bielevicz, 915 F.2d at 850. 'A sufficiently close causal link between . . . a known but uncorrected custom or usage and a specific violation is established if occurrence of the specific violation was made reasonably probable by permitted continuation of the custom.'  Id. at 851 (quoting Spell v. McDaniel, 824 F.2d 1380, 1391 (4th Cir. 1988) and adopting this

---

[8]  Pursuant to Pennsylvania statute, "[t]he mayor of the borough shall have the full charge and control of the chief of police and the police force, and he shall direct the time during which, the place where and the manner in which, the chief of police and the police force shall perform their duties . . . ." 53 P.S. § 46121.

formulation of the causation requirement). A failure to train amounts to deliberate indifference when the failure to train has caused a pattern of violations. <u>Kelly v. Borough of Carlisle</u>, 622 F.3d 248, 265 (3d Cir. 2010).

In the instant matter, Carl's Fourth Amendment municipal liability claims fail as a matter of law. Carl has failed to establish a deprivation of his Fourth Amendment rights, therefore he cannot establish a link between a Hughesville policy or custom and his injury, as he has suffered no Fourth Amendment injury. Moreover, the incidents of improper behavior or alleged improper behavior do not establish a policy or custom of sanctioning Fourth Amendment violations. Although Chief Shearer was warned in 2005 and 2007 about activity outside Hughesville, and department procedure, Chief Shearer's actions were not unconstitutional—they did not violate the Fourth Amendment. An arrest outside a police force's jurisdiction fails to assert a constitutional claim unless the arrest is without probable cause. <u>See</u> <u>Carter v. Bartle</u>, 1990 WL 156543 (E.D. Pa. 1990). Nor can the coffee incident, in which Chief Shearer was suspended for six weeks, establish acquiescence. All that remains to undergird plaintiffs' failure to train claim are a 2000 lawsuit which settled and a purported search and seizure of cellular telephones. The record evidence of these incidents is woefully inadequate to create a custom or policy of Fourth Amendment violations. The court will grant Hughesville's motion for summary judgment with respect to the malicious prosecution and false arrest claims.

## B.     First Amendment Retaliation

Carl, Melissa, and Bear and Hunter assert First Amendment retaliation claims against Chief Shearer, Officers Hockman and Palmeter, and Hughesville. (Doc. 18, at 25-28).  To prevail on a First Amendment retaliation claim, a plaintiff must prove: "(1) that he engaged in a constitutionally-protected activity; (2) that the government responded with retaliation; and (3) that the protected activity caused the retaliation." Miller v. Mitchell, 598 F.3d 139, 147 (3d Cir. 2010) (citing Eichenlaub v. Twp. of Ind., 385 F.3d 274 (3d Cir. 2004)).  The conduct of the governmental agent or body must be sufficient "to deter a person of ordinary firmness from exercising [their] First Amendment rights." McKee v. Hart, 436 F.3d 165, 170 (3d Cir. 2006) (citing Suppan v. Dadonna, 203 F.3d 228 (3d Cir. 2000)).  The "effect of alleged retaliation on protected activities need not be great in order to be actionable, but must be more than *de minimus*." Kougher v. Burd, 274 Fed. App'x 197, 200 (3d Cir. 2008) (citing McKee, 436 F.3d 165).

As mentioned, § 1983 liability claims "cannot be predicated solely on the operation of *respondeat superior*." Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005).  It is therefore incumbent upon the plaintiffs to establish that the defendants had "personal involvement" in the deprivation of the plaintiffs' rights, which can be shown by "allegations of personal direction or of actual knowledge and acquiescence." Id.  Plaintiffs must make such allegations with "appropriate particularity." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).

Chief Shearer and Officer Hockman construe plaintiff's retaliation claim as pertaining to a single event: Carl's inquiry on the night of June 6, 2009 with Officers Palmeter and Hockman regarding the duration of the vehicle stop. (Doc. 57, at 12-13). Chief Shearer and Officer Hockman contend that this inquiry was not the type of activity protected by the First Amendment. (Id. at 13). Moreover, they assert that there is no causal link between the inquiry and the alleged retaliation against Carl. (Id. at 14). Chief Shearer and Officer Hockman note that many of the allegedly protected statements were made by the Shultzs' attorney (and state representative) on their behalf and contend that it is unclear whether they were formal complaints or merely passing comments. (Doc. 86, at 11-12). Finally, Chief Shearer and Officer Hockman contend that the plaintiffs have failed to identify the date of the alleged instances of speech, and, hence, there is no indication of temporal proximity to the alleged retaliation. (Id.)

Officer Palmeter separately asserts in his motion for summary judgment that the record lacks support for the allegation that he retaliated against Carl for engaging in protected speech. First, Officer Palmeter argues that he lacked knowledge (and plaintiffs cannot establish he possessed knowledge) of any complaints by plaintiffs regarding the HBPD. Officer Palmeter suggests that he could not retaliate against speech of which he was unaware. With respect to Carl's contention that Officer Palmeter engaged in a conspiracy with other defendants to make false allegations against Carl after the June 6, 2009 traffic stop incident, Officer Palmeter notes that Chief Shearer testified that he did not consult with

Officer Palmeter about his decision to file charges.  (Doc. 60, at 12-13).  Officer

Palmeter also denies Carl's contention that, on one occasion he operated the

surveillance camera in his police cruiser in the BigDogz parking lot in retaliation

for Carl's complaints.  Finally, Officer Palmeter contends that summary judgment is

warranted because the purported retaliatory conduct predated the protected

activity: Carl complained about surveillance of BigDogz and claims that HBPD

conducted surveillance of BigDogz in retaliation for his complaints about the

surveillance of BigDogz.  (Id. at 14).

Carl and Melissa respond that their First Amendment retaliation claim is

rooted in a history of complaints to Hughesville—a great deal more than the June 6,

2009 traffic stop and subsequent affidavit of probable cause against Carl.  (Doc. 73,

at 16).  They contacted their state representative about HBPD targeting the

BigDogz establishment and contacted two mayors of Hughesville to stop the alleged

harassment.  (Doc. 72, at 14; Doc. 73, at 21-22).  Carl personally petitioned the Mayor

of Hughesville as well as the Board of Supervisors of Wolf Township to complain.

(Doc. 72, at 14; Doc. 73, at 21-22).  As a direct result of these actions, the Shultzs

contend that Chief Shearer, Officer Hockman and Officer Palmeter escalated the

harassing conduct and surveillance.  (Doc. 73, at 22).  The retaliatory conduct,

according to Carl, included the preparation of criminal charges containing false

statements, the prosecution's failure to disclose the dashboard video at the

preliminary hearing, continued blocking of the BigDogz driveway, reporting Carl to

the Pennsylvania Liquor Control Board, and targeted surveillance of Carl en route

to his home in the evening hours.  (Doc. 72, at 15; Doc. 73, at 22, 25).  The Shultzs also point to two specific events involving Officer Palmeter: the purportedly false testimony of Officer Palmeter at the preliminary hearing and an incident where Officer Palmeter drove his police cruiser to the front of BigDogz and activated the dashboard camera.  (Doc. 72, at 15).

The complaint and record evidence is devoid of any protected First Amendment activity by Bear and Hunter, Inc., therefore summary judgment will be granted to defendants with respect to this plaintiff.  See Levy, 510 F.3d at 762-63 (stating that a corporation lacks standing under § 1983 to sue for First Amendment retaliation in the absence of evidence showing the corporation engaged in any protected activity).  Similarly, Melissa admits that she never registered any complaints with Hughesville about police conduct.  (Doc. 58 ¶ 21, Doc. 75 ¶ 21; Doc. 76, Ex. C, at 8).  The remaining allegations of retaliation are based upon Carl's complaints to HBPD about surveillance, the filing of criminal charges against him, the report to the PLCB, and the continued surveillance and harassment after the traffic stop and subsequent to the filing of the initial complaint in this matter.

### 1.   Officer Palmeter

The record lacks any indication of retaliatory conduct by Officer Palmeter. Officer Palmeter made a valid traffic stop on the night of June 6, 2009 and his incident report on the traffic stop makes no mention of Carl.  In fact, Officer Palmeter testified that he was unaware of any complaints by Carl about HBPD conduct until after the June 6, 2009 traffic stop.  (Doc. 64 ¶ 53; Doc. 74 ¶ 53).  In

addition, Chief Shearer testified that he did not speak with Officer Palmeter about the preparation of the charges against Carl.  The other specific instance of purported retaliation involving Officer Palmeter is a claim that he pulled into the BigDogz parking lot and activated his dashboard camera.  Taking this allegation in the light most favorable to Carl, this single act is *de minimus* and cannot establish First Amendment retaliation.[9]  The court will grant summary judgment to Officer Palmeter on the First Amendment retaliation claim.

### 2.    Chief Shearer and Officer Hockman

In contrast, the specific allegations against Chief Shearer and Officer Hockman do create a triable First Amendment retaliation claim.  Chief Shearer testified to receiving near daily complaints about HBPD conduct around the BigDogz establishment.  After Carl asserted his belief that HBPD was intimidating patrons and informing Chief Shearer that he intended to contact his attorney, Chief Shearer initiated charges against Carl.  Chief Shearer and Officer Hockman discussed contacting the PLCB about Carl's business Valley Beverage, to report Carl's purported interference in the police traffic stop; in fact, Officer Hockman filed a complaint with the PLCB.  Asserting complaints to police and informing officers of an intent to seek legal redress for perceived violations of rights is

---

[9] Carl's conclusory allegations that "[i]t is reasonable to infer that Defendant Palmeter is one of the officers who followed Mr. Shultz," and that "Defendant Palmeter, retaliated against the Plaintiffs for exercising their First Amendment rights when they complained to his boss, the Mayor" fail to posit the required personal involvement of Officer Palmeter in retaliatory activity.

constitutionally protected activity.  Hence, a jury could find that Chief Shearer and

Officer Hockman retaliated against Carl.  Accordingly, the court will deny the

motion for summary judgment of Chief Shearer and officer Hockman with respect

to this claim.

### 3. **Hughesville Borough**

There is record evidence that Hughesville Borough Council and Hughesville

Mayors knew of the frequent complaints made by Carl regarding HBPD presence

near BigDogz.  Chief Shearer reported receiving near daily complaints from Carl

and others associated with the BigDogz establishment.  Chief Shearer notified

Mayor Welsh of these complaints against HBPD.  Both Carl and his attorney

contacted mayors about HBPd misconduct.  Yet, according to plaintiffs,

surveillance of BigDogz and harassment of its employees and customers continued.

A jury could reasonably find that Hughesville knew of the complaints by Carl,

patrons of BigDogz, and employees, alleging harassment by HBPD.  Further, a jury

could reasonably conclude that Hughesville acquiesced in improper conduct by

HBPD.  Thus, Hughesville's motion for summary judgment will be denied with

respect to the First Amendment retaliation claim.

### C. **Fourteenth Amendment Due Process**

Carl, Melissa, and Bear and Hunter, Inc. next allege that Chief Shearer and

Officer Hockman violated their substantive due process rights under the

Fourteenth Amendment.  (Doc. 18, at 28).  They claim that defendants deliberately

and arbitrarily abused their power and that the due process clause protects a

liberty or property interest in pursuing the "common occupations or professions of life." (Doc. 73, at 27).

Chief Shearer and Officer Hockman argue that plaintiffs' Fourteenth Amendment Due Process claim is misguided. (Doc. 57, at 14; Doc. 86, at 13). They assert that it is uncertain whether there exists a property interest in pursing common occupations or professions, but underscore that Carl lacks any ownership or employment interest in BigDogz. (Doc. 86, at 13). They construe Carl's claims as arising out of his allegation of wrongful arrest. Because the Fourth Amendment provides an explicit textual source of constitutional protection, defendants assert that the Fourth Amendment should guide the court's analysis of Carl's claims, rather than more general due process notions. (Doc. 57, at 14 (citing Doe v. Groody, 361 F.3d 232, 238 n.3 (3d Cir. 2004); Berg v. County of Alleghany, 219 F.3d 261, 268 (3d Cir. 2000)).

When analyzing a Fourteenth Amendment substantive due process claim, the court must be mindful that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process must be the guide for analyzing these claims." Albright v. Oliver, 510 U.S. 266, 273 (1994) (quoting Graham v. Connor, 490 U.S. 386, 395 (1989)) (internal quotations omitted); Doe v. Groody, 361 F.3d 232, 238 n.3 (3d Cir. 2004). With respect to Carl, to the extent he claims a substantive due process violation stemming from the charges filed against him, the Fourth Amendment provides an

33

explicit textual source of protection which guides the court's analysis of his claims. To the extent Carl and Melissa claim a liberty interest to conduct their businesses, substantive due process notions are applicable.

"The right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within both the 'liberty' and 'property' concepts of the Fifth and Fourteenth Amendments." Piecknick v. Commonwealth of Pennsylvania, 36 F.3d 1250, 1259 (3d Cir. 1994) (citing Greene v. McElroy, 360 U.S. 474, 492 (1959)). In 1923 the Supreme Court explained that the liberty guaranteed by the Fourteenth Amendment included not only the freedom from bodily restraint, but also the right "to engage in any of the common occupations of life." Meyer v. Nebraska, 262 U.S. 390, 399 (1923). Despite the broad language, the right is "fairly narrow." See Novak v. City of Pittsburgh, No. 2:05-cv-00897, 2006 WL 3420959, at *4 (W.D. Pa. Nov. 27, 2006). The Court did not constitutionalize all governmental action that affects pursuit of a profession. See Boyanowski v. Capital Area Intermdiate Unit, 215 F.3d 396, 404 (3d Cir. 2000) (citing Conn v. Gabbert, 526 U.S. 286 (1999)). Rather, the protected liberty interest is confined to pursuit of an occupation, not a particular job. Piecknick, 36 F.3d at 1261-62. A violation of that liberty is not established absent a complete revocation or a substantial interference with one's chosen occupation. Id. at 1261-62 (towing operator's right to pursue chosen occupation not unreasonably interfered with and thus no protected liberty interest alleged); see also Schware v. Bd. of Bar Exam'r of State of N.M., 353 U.S. 232 (refusing otherwise qualified applicant the right to take

34

examination for admission to state bar constituted denial of due process); <u>Gardner</u>
<u>v. City of Waukegan</u>, No. 98 C 5327, 1999 WL 410009, at * (N.D. Ill. June 4, 1999)
(stating that "[t]he deprivation of occupational liberty rises to the level of a
constitutionally protected right when a plaintiff is completely prevented from
pursing an occupation or is completely driven out of business" and concluding that
plaintiff only alleged a diminution of his ability to conduct his business).

Substantive due process also protects against the arbitrary exercise of
government power. <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 845-46 (1998).
However, "only the most egregious official conduct can be said to be 'arbitrary in
the constitutional sense.'" <u>Id.</u> at 846 (citing <u>Collins v. Harker Heights</u>, 503 U.S. 115,
129 (1992)).  To establish a substantive due process violation, the plaintiff must show
the government official's conduct "shocks the conscience." <u>Id.</u> at 846; <u>see</u> <u>also</u>
<u>Fagan v. City of Vineland</u>, 22 F.3d 1296, 1303 (3d Cir. 1994); <u>Savokinas v. Borough of</u>
<u>Avoca</u>, Civ. A. No. 3:07-CV-2311, 2010 WL 235132, at *5 (M.D. Pa. Jan. 19, 2010).
What qualifies as conscience-shocking conduct depends upon the unique factual
circumstances of each case. <u>Lewis</u>, 523 U.S. at 850.

In the instant matter, it is undisputed that Carl is neither an owner or
employee of BigDogz.  He cannot claim a legitimate substantive due process
violation for purported harassment at a business when he does not own or work the
subject business subjected to the purported harassment.  He has neither a liberty
nor property interest with respect to BigDogz.  The allegations in the complaint
regarding police conduct at Valley Beverage, the business owned by Carl, are

sparse—an incident in which an individual was pulled over after exiting Valley

Beverage, and an incident in which HBPD made a DUI arrest in the parking lot of

the business and refused to move the arrestee's vehicle.  Similarly, Melissa has not

established a revocation or substantial interference with the right to pursue her

occupation.  See Gardner, 1999 WL 410009, at *4 ("The deprivation of occupational

liberty rises to the level of a constitutionally protected right when a plaintiff is

completely prevented from pursing an occupation or is completely driven out of

business.") (citing Greene v. McElroy, 360 U.S. 474, 475-76 (1959) and Schware, 353

U.S. 238-39); c.f. San Jacinto Sav. & Loan v. Kacal, 928 F.2d 697 (5th Cir. 1991)

(owner of soda fountain and arcade business stated viable claim against city and

city police for violating her property and liberty interest in operating her business

by their comprehensive and concerted harassment of customers ultimately leading

to the closure of her business); Benigni v. City of Hemet, 879 F.2d 473, 478 (9th Cir.

1988) (finding sufficient evidence to support due process claim against police for

harassment that forced bar owner to sell bar at a loss, and describing that "bar

checks occurred nightly, up to five or six times per night, that customers were

frequently followed from the [bar] and sometimes arrested, that staff and customers

frequently received parking tickets, that officers parked at the old train depot

across the street, and that there were usually three or four officers there at all times

in the evening, and that cars were often stopped in the vicinity of the [bar] for traffic

violations that had occurred elsewhere").  Viewing the evidence in the light most

favorable to all the plaintiffs, the defendants' conduct was not so egregious or

36

outrageous as to "shock the conscience."  The court will grant summary judgment to Chief Shearer and Officer Hockman on the substantive due process claim.

### D.   State Law Claims[10]

#### 1.   Malicious Prosecution

In addition to his Fourth Amendment malicious prosecution claim, Carl asserts a state law cause of action for malicious prosecution against Chief Shearer, Officer Hockman and Officer Palmeter.  To succeed, he must establish that the defendant: "(1) instituted proceedings against the plaintiff, (2) without probable cause, (3) with malice, and (4) that the proceedings were terminated in favor of the plaintiff."  Corrigan v. Cent. Tax Bureau of Pa., 828 A.2d 502, 505 (Pa. Commw. Ct. 2003).  Unlike its § 1983 counterpart, the state malicious prosecution claim does not require the deprivation of a constitutional right, that is, Carl need not establish a seizure.

Chief Shearer and Officer Hockman contend that Carl lacks evidence to prove the second and third elements of malicious prosecution, *to wit*: that the proceedings were instituted without probable cause, and that the proceedings terminated in Carl's favor.  (Doc. 57, at 15; Doc. 86, at 14).  Chief Shearer and Officer Hockman assert that the decision to *nol pros* the charges against Carl is not necessarily indicative of his innocence, and that charges only terminate favorably when there is indication that the accused is innocent.  (Doc. 86, at 14). They argue

---

[10]   The court exercises supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

that the record is silent regarding the reasons for the prosecutor's decision to *nol pros* the charges and opine that the decision could have been the result of a lack of prosecutorial resources.  (Id.)  On the issue of probable cause, they assert that there is a presumption that the charges are supported by probable cause when criminal proceedings are initiated after seeking the advice of counsel in good faith and with full disclosure of the facts.  (Id.)

Carl counters by pointing to the affidavit provided Attorney Mitchell, in which he states that he *nol prossed* the charges after viewing the dashboard camera video of the June 6, 2009 traffic stop.  (Doc. 73, at 30).  Attorney Mitchell explained that he "did not believe probable cause existed to continue the case" after reviewing the video.  (See Doc. 80, Ex. DD ¶ 6).  On this evidence Carl contends that he has established favorable termination.  Carl asserts that defendants lacked probable cause and put knowingly false statements in the affidavit of probable cause in order to pursue charges.

In his separate motion for summary judgment, Officer Palmeter contends that Carl has not established the first element of a malicious prosecution claim: that Officer Palmeter initiated criminal proceedings against Carl.  (See Doc. 60, at 10-13).  Officer Palmeter testified that he did not participate in the preparation of the charging documents.  (Id. at 11).  Moreover, Chief Shearer, who prepared and filed the criminal complaint and affidavit of probable cause, has acknowledged that he did not discuss the preparation of those documents with Officer Palmeter or Officer Hockman.  (Id. at 11).  Officer Palmeter contends that Chief Shearer is solely

responsible for initiating the complaint against Carl "from start to finish." (Id. at 13).

With respect to the initiation of charges, Carl contends that the term "initiated" extends beyond mere signing of the criminal complaint, and includes conspiracy to have criminal charges filed or procuring the arrest and prosecution of another by providing false information to the police.  (Doc. 72, at 10-11); See Cameron v. City of Philadelphia, Civ. A. No. 90-2928, 1991 WL 218433 at *2 (E.D. Pa. 1991) (allowing case to proceed against Defendant Officer although she was not the one who filed the criminal charges due to the fact that she conspired with other officers to have the charges filed).  Carl contends that the criminal complaint contained false information which "had to be provided by Defendant Palmeter to Chief Shearer." (Id. at 12).  Carl argues that "[i]t is reasonable to infer that Officer Palmeter did speak with Chief Shearer before the final charges and affidavit of probable cause were filed." (Id.)  Carl also asserts that Officer Palmeter testified falsely at the preliminary hearing on the charges, by stating that both he and Officer Hockman told Carl to leave and that Carl remained several minutes after the command.  (Id. at 12).  Hence, Carl contends that Officer Palmeter played an instrumental role in the initiation and prosecution of the charges against him.  (Id. at 13).  Similarly, Carl contends that Officer Hockman initiated the criminal proceedings through his intimate involvement in the matter: Officer Hockman radioed for Chief Shearer's assistance due to Carl's presence at the scene of the traffic stop; Officer Hockman misrepresented to Chief Shearer that he advised Carl

to move away from the scene; Officer Hockman provided the microphone to record the conversation with Carl outside of BigDogz; Officer Hockman prepared a police report that purportedly contained false statements used by Chief Shearer to prepare the criminal complaint, and Officer Hockman allegedly testified falsely at the preliminary hearing.  (Doc. 73, at 12-13).

### a.   <u>Initiate Proceedings</u>

Carl relies heavily on <u>Cameron v. City of Philadelphia</u>, Civ. A. No. 90-2928, 1991 WL 218433 (E.D. Pa. Oct. 18, 1991), to support his contention that Officer Hockman and Officer Palmeter initiated the criminal proceedings against him despite their lack of involvement in the preparation and filing of the criminal complaint and affidavit of probable cause.  In <u>Cameron</u> an off-duty Philadelphia police officer was involved in a heated dispute with plaintiffs over a parking space that escalated to a physical struggle.  <u>Id.</u> at *1.  After the incident, investigating officers filed criminal charges against the plaintiffs.  Some charges were dismissed and plaintiffs were acquitted on the remaining charges.  <u>Id.</u>  Plaintiffs subsequently filed a civil rights action alleging malicious prosecution, among other causes of action.  <u>Id.</u>  The off-duty officer filed a motion for summary judgment asserting that she took no part in initiating or filing the criminal charges beyond providing a statement to officers immediately after the incident.  <u>Id.</u> at *2.  The court denied the motion on this cause of action noting that the defendant officer did not deny that she conspired with other officers to pursue criminal charges against the plaintiffs. <u>Id.</u>

40

There is no dispute that Chief Shearer initiated the charges against Carl. However, Officers Palmeter and Hockman contend that they did not initiate charges and cannot be held liable.  "If a party procures the arrest and prosecution of another by providing false information to the police, that party may be subject to a charge of malicious prosecution."  Cameron, 1991 WL 218433 at *2 (citing Bragle v. Revell, 674 F. Supp. 13, 15 (W.D. Pa. 1987); see also Shoop v. Dauphin County, 766 F. Supp. 1327, 1338 (M.D. Pa. 1991) (although defendants did not issue the criminal complaint they were "intimately involved" in the criminal proceedings "from beginning to end" which is "sufficient to say that they 'initiated' the proceedings"). Officers Palmeter and Hockman both prepared incident reports on the June 6, 2009 traffic stop.  Officer Palmeter's report is short and mentions only the DUI traffic stop.  There is nothing in the record to indicate that Officer Palmeter took steps to procure the filing of the criminal complaint and affidavit of probable cause against Carl.  Carl's conclusion that "[i]t is reasonable to infer that Officer Palmeter did speak with Chief Shearer before the final charges and affidavit of probable cause were filed," is not supported by evidence in the record.  Rather, Officer Palmeter's incident report and Chief Shearer's testimony that Officer Palmeter did not assist in the filing of charges establish the contrary and are uncontradicted by other evidence in the record.  Officer Palmeter's motion for summary judgment will be granted.

With respect to Officer Hockman, however, there is evidence in the record that Officer Hockman helped procure the filing of the affidavit of probable cause

and criminal complaint against Carl.  Officer Hockman's incident report details

Carl's purported interference in the traffic stop.  His incident report on the traffic

stop and his statements to Chief Shearer about Carl's involvement in the stop

create a factual dispute as to whether he provided false information in order to

procure the filing of criminal charges against Carl.  Considering the evidence in the

light most favorable to Carl, a jury could reasonably conclude that Officer Hockman

initiated the charges against Carl.  The court will therefore consider whether Carl

has put forth evidence on the remaining elements.

### b.    <u>Favorable Termination and Probable Cause</u>

Pennsylvania courts look to the Restatement of Torts to inform their

understanding of what constitutes a favorable termination.  <u>See</u> <u>Haefner v. Burkey</u>,

626 A.2d 519, 521 (Pa. 1993).  Pursuant to the Restatement (Second) of Torts:

> Criminal proceedings are terminated in favor of the accused by
>     (a) a discharge by a magistrate at a preliminary hearing, or
>     (b) the refusal of a grand jury to indict, or
>     (c) the formal abandonment of the proceedings by the public
>     prosecutor, or
>     (d) the quashing of an indictment or information, or
>     (e) an acquittal, or
>     (f) a final order in favor of the accused by a trial or appellate
>     court.

RESTATEMENT (SECOND) OF TORTS § 659 (1977).  The commentary to this section of

the Restatement—particularly with respect to part (c), "the formal abandonment of

the proceedings by the public prosecutor"—completely belies Chief Shearer and

Officer Hockman's contention that the *nol pros* of the charges does not establish a

favorable termination.  The comments read in pertinent part: "The usual method

42

by which a public prosecutor signifies the formal abandonment of criminal proceedings is by the entry of a nolle prosequi . . . . [T]he entry constitutes a termination of the proceedings in favor of the accused."  <u>Id.</u> cmt. e; <u>see also</u> <u>Haefner</u> <u>v. Burkey</u>, 626 A.2d 519, 521 (Pa. 1993) (prosecution's *nolle pros* of charges was formal abandonment of criminal proceedings thus terminating proceedings in favor of defendant).  Chief Shearer and Officer Hockman's contention that the *nolle prosequi* of charges against Carl does not establish the element of favorable termination is without merit.

Similarly, their arguments about probable cause are unpersuasive.  There is a material factual dispute as to the existence of probable cause to support the affidavit of probable cause and criminal complaint against Carl.  "[P]robable cause exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested."  <u>Orsatti</u>, 71 F.3d at 483 (citing <u>Dunaway v. New York</u>, 442 U.S. 200, 208 n.9 (1979) and <u>United States v. Cruz</u>, 910 F.2d 1072, 1076 (3d Cir. 1990)); <u>Wagner v. Waitlevertch</u>, 774 A.2d 1247, 1253 (Pa. Super. Ct. 2001); <u>Manley v. Fitzgerald</u>, 997 A.2d 1235, 1239 (Pa. Commw. Ct. 2010); <u>see also</u> <u>Brinegar v. United States</u>, 338 U.S. 160, 175-76 (1949).  Evidence sufficient to prove guilt beyond a reasonable doubt is not required.  <u>Orsatti</u>, 71 F.3d at 843.  The existence of probable cause is a question of law for the court unless there is a material factual dispute on the issue of probable cause.  <u>McKibben v. Schmotzer</u>, 700 A.2d 484, 492-93 (Pa. Super. Ct. 1997).

When, a plaintiff challenges probable cause to file charges on the basis that the officer submitted a false affidavit to the judicial officer, the plaintiff has the burden of proving two elements.  See Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir. 1997).  Carl must establish that "(1) [the defendant] knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions in his affidavit of probable cause that create a falsehood in applying for an arrest warrant; and (2) such statements or omissions are material to the finding of probable cause." Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782, 789 (3d Cir. 2000) (citing Franks v. Delaware, 438 U.S. 154, 171-72 (1978) and Sherwood, 113 F.3d at 399); Wagner, 774 A.2d at 1253.  An omission is made with reckless disregard for the truth when "an officer withholds a fact in his ken that any reasonable person would have known that this was the kind of thing the judge would wish to know."  Wilson v. Russo, 212 F.3d 781, 788 (3d Cir. 2000) (citing United States v. Jacobs, 986 F.2d 1231, 1235 (8th Cir. 1993)) (internal quotations omitted); Commonwealth v. Taylor, 850 A.2d 684, 689 (Pa. Super. Ct. 2004) (adopting Third Circuit reasoning with respect to omissions to an affidavit of probable cause).  A statement is made with reckless disregard for the truth if the officer or affiant proffers them 'with [a] high degree of awareness of their probable falsity.'  Lippay v. Christos, 996 F.2d 1490, 1501 (3d Cir. 1993) (quoting Garrison v. Louisiana, 379 U.S. 64, 74 (1964)) (alteration in original).

The affidavit of probable cause and preliminary hearing testimony indicate that Carl refused to leave the area of the traffic stop, (see Doc. 80, Ex. X; Doc. 79, Ex. Q, at 7-9, 63-64), however the dashboard camera video and surveillance video

44

from BigDogz indicate that Officer Hockman did not order Carl to leave and that

Carl retreated after being told to do so by Officer Palmeter.  (See Doc. 81, Exs. HH,

II).  Chief Shearer stated that he reviewed the police cruiser video in preparing the

criminal complaint and affidavit of probable cause, and that he had to enter

BigDogz to speak with Carl, both of these factors create a material factual dispute

as to the veracity of his claim in the affidavit of probable cause that Carl refused to

leave the area or otherwise interfered in the stop.  Carl's refusal to leave was also

the key factor in a finding of probable cause for his alleged interference with the

police stop, thereby establishing the second element of his false arrest claim.

Attorney Mitchell's approval of the affidavit and criminal complaint prior to

its filing does not preclude liability.  The presumption of probable cause stemming

from the prior approval of charges by counsel is inapplicable here.  In the instant

matter Carl disputes that Chief Shearer fully disclosed the facts to Attorney

Mitchell.  Instead, by affidavit, Attorney Mitchell stated that a review of the police

cruiser dashboard camera video lead him to believe that probable cause did not

exist for the charges.  The court will therefore deny Chief Shearer and Officer

Hockman's motion for summary judgment on the state law malicious prosecution

claim.

### 2.    **Wiretap Act**

Carl next alleges that Chief Shearer and Officer Hockman violated the

Wiretapping and Electronic Surveillance Control Act on the night of June 6, 2009,

when they recorded the conversation with Carl outside BigDogz without Carl's

knowledge.  The Pennsylvania Wiretapping and Electronic Surveillance Control

Act ("Wiretap Act"), 18 Pa. Cons. Stat. § 5701 *et seq*., permits civil suits by

individuals whose wire, electronic or oral communications are unlawfully

intercepted or disclosed in violation of the act.  To establish a prima facie case

under the Pennsylvania Wiretap Act, a plaintiff must demonstrate:  "(1) that he

engaged in [an oral] communication; (2) that he possessed an expectation that the

communication would not be intercepted; (3) that his expectation was justifiable

under the circumstances; and (4) that the defendant attempted to, or successfully

intercepted the communication, or encouraged another to do so."  Kline v. Sec.

Guards, Inc., 386 F.3d 246, 257 (3d Cir. 2004) (quoting Agnew v. Dupler, 717 A.2d

519, 522 (Pa. 1998)).  In order to have a reasonable expectation of privacy in an oral

communication, the expectation must be one that society is willing to recognize as

reasonable—an objective standard.  Id.

Chief Shearer and Officer Hockman contend that Carl lacked any

expectation of privacy in the conversation that occurred in the BigDogz parking lot.

(Doc. 57, at 17-18).  They note that employee Troy Hanson was present and any

customer entering or exiting the establishment could overhear the conversation.

(Id. at 18).  Because Carl had no reasonable expectation of privacy in the

conversation, Chief Shearer and Officer Hockman assert that the conversation does

not qualify as an oral communication within the meaning of the Pennsylvania

Wiretap Act,[11] and summary judgment in their favor is warranted.  (Id.)

Carl counters that he had a clear expectation of privacy in the

communication.  (Doc. 73, at 30-31).  He notes that he was inside BigDogz when

Chief Shearer and Officer Hockman allegedly insisted he step outside.  (Id.)  He

states he was not advised that the conversation was being recorded, that no

recording device was visible, and that the only other individual in the vicinity of the

conversation besides the officers and himself was employee Troy Hansen.  (Id. at

31).

In Agnew v. Dupler, the Pennsylvania Supreme Court addressed whether a

plaintiff police officer has a reasonable expectation of privacy in his

communications with other officers for purposes of the Wiretap Act.  There, a police

chief activated the intercom function on the telephone in the squad room, then

retreated to his office to listen to the conversations of officers on the night shift.  A

police officer whose conversation was overheard while he was on duty and in the

police squad room sued under the Wiretap Act.  The Pennsylvania Supreme Court

rejected the Wiretap Act claim, finding that the officer lacked a reasonable

expectation of privacy in his conversations.  The court explained that the

conversation occurred in a common area, among other officers, and could be

---

[11]  An "oral communication" is defined under the Act as: "Any oral communication uttered by a person possessing an expectation that such communication is not subject to interception under circumstances justifying such expectation."  18 PA. CONS. STAT. § 5702.

overheard in the surrounding areas due to the ajar door, and noted that officers were aware of the intercom system in the squad room, including its two-way communication capabilities.  <u>Agnew</u>, 717 A.2d at 524.

Carl's conversation with Chief Shearer and Officer Hockman occurred outside, in the parking lot of BigDogz, and the record evidence establishes that he requested the presence of his bartender, Troy Hansen.  (<u>See</u> Doc. 81, Ex. HH). Anyone walking by could have overheard the conversation, and Carl had no property interest in the location, as he is neither an employee or an owner of the establishment.  Moreover, Carl asserted that he did not wish to step outside, and that anything the officers had to say could be said to him in the bar.  (<u>Id.</u>)  Carl desired that others be present for the conversation, and, in fact, called upon an employee of BigDogz to listen in, thus, he cannot claim a reasonable expectation of privacy in the conversation.  The court will grant Chief Shearer and Officer Hockman's motion for summary judgment with respect to the Wiretap Act claim.

### 3.    <u>Defamation and Invasion of Privacy</u>

Finally, Carl brings a state law defamation claim against Chief Shearer and Officer Hockman.  (Doc. 18 ¶ 177-184).  He alleges harm to his reputation stemming from the July 2, 2009 newspaper article appearing in the *Williamsport Sun-Gazette*. Similarly, Bear and Hunter, Inc. claims invasion of privacy against Chief Shearer and Officer Hockman stemming from the newspaper article (<u>id.</u> ¶¶185-187), contending that the article portrayed Bigdogz in a false light as an unsafe and poorly operated establishment.

48

In order to succeed on a claim of defamation a plaintiff must establish seven statutorily defined elements, *to wit*: (1) the defamatory character of the communication; (2) publication by the defendant; (3) application to the plaintiff; (4) understanding by the recipient of its defamatory meaning; (5) understanding by the recipient that the communication is intended to apply to the plaintiff; (6) special harm to the plaintiff resulting from publication; and (7) abuse of a conditionally privileged occasion.  See 42 PA. CONS. STAT. § 8343(a)(1)-(7); see also Smith v. Wagner, 588 A.2d 1308, 1311 (Pa. Super. Ct. 1991).

A false light or invasion of privacy claim involves "publicity that unreasonably places the other in a false light before the public." Keim v. County of Bucks, 275 F. Supp. 2d 628, 636-37 (E.D. Pa. 2003) (quoting Rush v. Philadelphia Newspapers, Inc., 732 A.2d 648, 654 (Pa. Super. Ct. 1999)) (citations and quotations omitted).  "The elements to be proven are publicity, given to private facts, which would be highly offensive to a reasonable person and which are not of legitimate concern to the public." Id.

Chief Shearer and Officer Hockman contend that plaintiffs fail to establish a causal link between their conduct and the publishing of the newspaper article. They observe that the article identifies that the source of the information as "court papers" and that they had no contact with the press regarding to the news article. (Doc. 57, at 18-19).  They assert that the institution of criminal charges and criminal court proceedings cannot form the basis of a defamation or invasion of privacy claim.  (Id. at 19-20).

49

Carl admits that the source of information in the news article was the public records of the criminal charges and affidavit of probable cause.  However, Carl contends that the legal paperwork is sufficient to establish a viable cause of action for defamation and invasion of privacy when that legal documentation contains knowingly false statements and is filed with malice.  (Doc. 73, at 32).  Carl highlights four statements in the affidavit of probable cause that he believes to be false and concludes that they "were done with clear malice aforethought . . . and represent a conspiracy to wrongfully prosecute Mr. Shultz."  (Id. at 33).  The wrongful prosecution resulted in public documents with false statements which were printed in a news article that negatively impacted Carl's reputation.[12]  (Id.)

Chief Shearer and Officer Hockman's contention that the criminal complaint and affidavit of probable cause cannot form the basis of a defamation claim appears to be an assertion that the documents receive a privileged status.  "Communications which are made on a proper occasion, from a proper motive, in a proper manner, and which are based upon reasonable cause are privileged."  Thompson v. Wagner, 631 F. Supp. 2d 664, 686 (W.D. Pa. 2008) (quoting Moore v. Nettleton, 889 A.2d 1262, 1268 (Pa. Super. Ct. 2005)).  "Abuse of a conditional privilege is indicated when the

---

[12]  In their brief in opposition to summary judgment, plaintiffs indicate that the newspaper article negatively impacted both Carl and Melissa Shultz.  (Doc. 73, at 33).  The court notes, that Melissa Shultz was not named in the amended complaint as a party to the defamation count.  (See Doc. 18, at 31) (stating under Count XII "Plaintiffs Carl Shultz and Cindy Shultz v. Defendants Shearer and Hockman; Defamation").  Therefore, the court will not address a claim of defamation by Melissa.

publication is actuated by malice or negligence, is made for a purpose other than that for which the privilege is given, or to a person not reasonably believed to be necessary for the accomplishment of the purpose of the privilege, or includes defamatory matter not reasonably believed to be necessary for the accomplishment of the purpose." Id. (quoting Beckman v. Dunn, 419 A.2d 583, 588 (Pa. Super. Ct. 1980)).  Carl disputes that the criminal complaint and affidavit of probable cause where filed with proper motive based upon reasonable cause.  He contends that Chief Shearer and Officer Hockman lacked probable cause for the charges filed against Carl and made false statements in the affidavit of probable cause.  As discussed above, a reasonable jury could conclude that the affidavit of probable cause contained false statements.  If established, a privilege would not exist.  See id. at 685-89 (allowing defamation claim based upon purported knowingly false statements in the affidavit of probable cause to proceed against police officers).  Therefore, summary judgment in the defendant's favor is not warranted on Carl's defamation claim.  However, Bear and Hunter Inc.'s invasion of privacy claim fails as a matter of law.  The two incidents in the newspaper article were not private facts.  It is undisputed that the author of the article gleaned the information from public documents, as such, there was nothing private about the incidents and Bear and Hunter Inc. cannot establish an invasion of privacy claim.

**IV.**   **Conclusion**

For the reasons stated in the foregoing memorandum, the court will grant in part, and deny in part the motions for summary judgment.

An appropriate order follows.


   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge


Dated:      July 29, 2011

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CARL F. SCHULTZ, JR., CINDY** | : | **CIVIL ACTION NO. 4:10-CV-0262** |
| **SCHULTZ, MELISSA SCHULTZ,** | : | |
| **and BEAR & HUNTER, INC.,** | : | **(Judge Conner)** |
| **t/d/b/a BIGDOGZ SPORTS BAR,** | : | |
| | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **HUGHESVILLE BOROUGH,** | : | |
| **RICHARD SHEARER,** | : | |
| **KURT V. HOCKMAN, and** | : | |
| **MICHAEL PALMETER,** | : | |
| | : | |
| **Defendants** | : | |

## ORDER

AND NOW, this 29th day of July, 2011, upon consideration of the motion for summary judgment (Doc. 59) filed by defendants Hughesville Borough and Michael Palmeter, and the motion for summary judgment (Doc. 56) filed by defendants Richard Shearer and Kurt Hockman (Doc. 56), and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that:

1.  The motion (Doc. 59) filed by Hughesville Borough and Michael Palmeter is granted in part and denied in part as follows:

    a.  The motion is GRANTED with respect to all remaining claims against Michael Palmeter, and the Fourth Amendment claims against Hughesville Borough.

    b.  The motion is DENIED in all other respects.

2.     The motion (Doc. 56) filed by Richard Shearer and Kurt Hockman is granted in part and denied in part as follows:

   a.     The motion is GRANTED with respect to all counts brought by Cindy Shearer.

   b.     The motion is GRANTED with respect to all official capacity claims.

   c.     The motion is GRANTED with respect to the counts of Fourth Amendment malicious prosecution and false arrest, Fourteenth Amendment substantive due process, the Wiretap Act claim, intentional infliction of emotional distress, and false light.

   d.     The motion is DENIED in all other respects.

3.     A revised pretrial and trial schedule shall issue by future order of the court.


   S/ Christopher C. Conner
   CHRISTOPHER C. CONNER
   United States District Judge